IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **CLARK DISTRIBUTION**<br>  **SYSTEMS, INC.**<br>     **Plaintiff**<br>**v.**<br>**ALG DIRECT INC.**<br>     **Defendant** | **NO. 1:10-CV-2575**<br><br>**JUDGE CONNER**<br><br>**MAGISTRATE JUDGE METHVIN** |

-------------------------------------------------

**THE CLARK GROUP, INC.**
        **Plaintiff**

**v.**

**ALG DIRECT, INC.**
        **Defendant/Third Party Plaintiff**

**v.**

**CLARK DISTRIBUTION**
  **SYSTEMS, INC.**
        **Third-Party Defendant**

### REPORT AND RECOMMENDATION
### ON MOTION TO DISMISS
### (Doc. 58)

Clark Distribution Systems, Inc., ("CDS"), filed this diversity breach of contract suit on December 17, 2010 (Doc. 1), and filed an amended complaint on July 29, 2011. (Doc. 33).[1] Defendant ALG Direct, Inc, filed an answer with

---

[1] CDS is a Delaware corporation with a principal place of business in New Jersey, and American Logistics Group, d/b/a ALG Direct, Inc., is a Illinois corporation with a principal place of business in Illinois.

counterclaims on September 10, 2012. (Doc. 57). This court has diversity jurisdiction under 28 U.S.C. §1332, and the jurisdictional amount has been met.[2]

Before the court is Clark's motion to dismiss two of ALG's counterclaims.[3] After CDS filed its motion, ALG voluntarily withdrew the counterclaim based upon negligent misrepresentation. Thus, the only issue for consideration is whether ALG has stated a counterclaim for tortious interference. (*See* Doc. 60).

The motion to dismiss has been referred to the undersigned for a report and recommendation, and is now ripe for disposition.[4]

## FINDINGS AND RECOMMENDATIONS

### I. Background

*Amended Complaint*

According to the amended complaint, plaintiff CDS does business as a "freight forwarder," meaning it facilitates the delivery of newsstand publications,

---

[2] As indicated by the caption, this breach of contract suit by CDS has been consolidated with a separate suit filed against ALG by CDS's parent company, The Clark Group, Inc. The latter suit is for alleged breach of a real estate lease related to the same operative facts. *See* Order of Consolidation dated January 26, 2012 (Doc. 48).

[3] On September 28, 2012, CDS filed a partial motion to dismiss and supporting brief, seeking dismissal of two of the seven counterclaims asserted against it by ALG in its answer. (Docs. 58, 59). ALG filed a brief in opposition to the motion on October 11, 2012 (Doc. 60), to which CDS filed a reply brief on October 23, 2012. (Doc. 61).

[4] On January 11, 2013, Judge Conner referred the pending motion to dismiss to undersigned. (Doc. 64).

magazines, and mass-market mailings from publishing and printing companies to their consignees, including the U. S. Postal Service (USPS). (Doc. 33, ¶¶ 6-8, Complaint). CDS is required to strictly comply with all USPS regulations with respect to the condition of the materials delivered. (*Id*. ¶ 9). ALG Direct, Inc. is a logistics provider which coordinates the distribution of printed materials. (*Id*. ¶ 10).

On June 28, 2010, ALG and CDS entered into a contract whereby ALG agreed to pay CDS as freight forwarder and "furnish transportation and related services as directed by ALG for the transportation of printed matter and materials, equipment and supplies for distribution to USPS locations and other locations for ALG as may be tendered to [CDS] from time to time." (Transportation Agreement) (*Id.* ¶ 12; Ex. A). The contract states that CDS is to invoice ALG within 10 days and that ALG shall pay the invoices within 40 days of the invoice date. (*Id*. ¶ 17).

Patrick Del Monico, the then-President of ALG, represented to CDS that the volume of shipments it would provide under the contract would be the same as submitted for quote prior to the contract, or approximately 11% higher. (*Id*. ¶ 14). Del Monico further represented that the commodity would be tendered to CDS in an acceptable condition consistent with the prior course of dealings between CDS and ALG. (*Id*. ¶ 15). CDS contends both representations by Del Monico were

material to the manner in which it undertook preparation to perform under the contract and that it materially relied thereon. (*Id*. ¶ 16).

CDS maintains that an important component of its relationship with ALG, of which ALG was well-aware, is that the commodity it to be shipped in a condition acceptable for transfer to the U.S. Postal Service, meaning that the commodity must be properly sorted and prepared and accompanied by proper documentation. (*Id*. ¶¶ 18, 19, 20). The commodity actually tendered, CDS argues, was not in compliance with Postal Service regulations, *to wit.*, they were improperly arranged, had inaccessible bar codes and lacked the required paperwork. (*Id*. ¶¶ 21, 22). As a result, CDS was required to expend significant time, resources and manpower to convert the shipments from ALG into a condition acceptable by the Postal Service. (*Id*. ¶ 23). CDS further contends that ALG shipments were over 100% higher than quoted, exceeding its representation that the volume would be no higher than 11% over the quotation. (*Id*. ¶ 24).

CDS avers it incurred losses of $337,997.00 attributable to efforts to conform the shipments and handle the additional volume. (*Id*. ¶ 25). It further submits that ALG has unpaid invoices totaling $681,474.13. (*Id*. ¶ 27).

*Motion to Dismiss*

For purposes of the motion to dismiss, the factual averments of the counterclaim will be accepted as true. CDS maintains a distribution center in Harrisburg, Pennsylvania and maintains other distribution centers in California, Illinois, Missouri, New Jersey, Tennessee and Texas. (Doc. 57, p. 13 ¶ 3). As noted above, ALG is in the business of aggregating or consolidating mail of companies primarily distributing advertising for other companies for insertion into the U.S. Postal Service. (*Id*. p. 14 ¶ 5).

In addition to the June 28, 2010 contract between ALG and CDS (Transportation Agreement), ALG also contracted with CDS's parent, The Clark Group, Inc. ("Clark") on June 22, 2010, to sublease space in the Harrisburg facility to maintain, consolidate and coordinate shipments arranged by ALG. (Sublease Agreement) (Doc. 57, p. 15 ¶ 11). CDS had sole care, custody and control of the facility, including receipt and handling of ALG's shipments into the distribution center; maintenance of shipments in the facility; and consolidation, preparation and delivery of shipments. (*Id*., p. 15 ¶ 12).

ALG entered into a contract with a client, Vertis, Inc., on June 9, 2010 for consolidation and transportation of direct marketing materials provided by Vertis and/or its customers. (*Id*., p. 15 ¶ 13). On or about October 4, 2010, ALG directed

Vertis to deliver its mail to the Harrisburg facility. (*Id*., p. 16 ¶ 14). ALG admits that some shipments tendered by Vertis did not comply with USPS regulations, but that CDS committed to handle these non-conforming shipments. (*Id*., p. 7, Answer to ¶ 21 of the Complaint). [5] Vertis' shipments were a "Type 3," which were freight-palletized but without USPS Form 8125's. (*Id*., p. 17 ¶ 18(c)). They were also shrink wrapped, sometimes combining different jobs, and therefore required "unloading, breaking down pallets, grouping pallets, securing Form 8125's that arrive 2 to 3 days later, matching the 8125's to the pallets, and then converting to Type 1 shipments for delivery." (*Id*.). ALG advised Vertis to refrain from placing certain codes inside the shrink wrap to facilitate the identification and grouping of pallets to Form 8125's. (*Id*., p. 17 ¶ 19).

Although ALG maintained no employees or supervisors at the Harrisburg facility at the time, it sent a representative there on October 5, 2010 to categorize the type of mail received for purposes of training CDS employees. (*Id*., p. 16 ¶¶ 15, 18). ALG offered help in the use of ALG's system for data entry and inventory but CDS declined, preferring its own system. (*Id*., p. 17 ¶ 20). The ALG representative left the Harrisburg facility on October 10, 2010, after CDS stated that it was fully

---

[5] ALG also claims that CDS accepted the shipments without providing prompt notice to ALG that the shipments were tendered in an improper manner. (Doc. 57, ¶ 30).

trained and able to handle all types of freight being received. (*Id*., p. 18 ¶ 22). When the representative returned to the facility on October, 19, 2010, CDS advised that Types 2 and 3 mail were not being properly handled. (*Id*., p. 18 ¶ 24). The representative finished retraining CDS personnel to handle Types 1, 2 and 3 freight. (*Id*., p. 18 ¶ 26). Although CDS represented it knew how to handle the mail, it failed to properly deliver ALG's freight. (*Id*., p. 18 ¶ 27).

ALG maintains that it inquired frequently as to timely delivery of shipments from the Harrisburg facility given the time-sensitive nature of the mail insertions. (*Id*., p. 20 ¶ 33). ALG also requested proofs of delivery in order to invoice its customers. (*Id*., p. 20 ¶ 34). ALG submits that Clark's failure to timely deliver shipments from its Harrisburg facility exposed ALG to claims by its customers, and also subjected ALG to loss of customers using its services. (*Id*., p. 20–21 ¶¶ 35, 36).

CDS repeatedly indicated that it was meeting ALG's requirements, *to wit*: CDS represented that it had no issue with Type 1 and Type 2 freight and, on October 18 and 19, 2010, CDS represented that all deliveries had been properly handled. (*Id*., p. 21 ¶ 37). On October 25, 2010, CDS notified ALG that it was having difficulty with Type 3 freight from Vertis. (*Id*., p. 21 ¶ 38). CDS notified ALG on November 2, 2010 that it could not handle the improperly loaded freight

received from Vertis without additional costs for additional employees, to which ALG agreed. (*Id*., p. 21–22 ¶¶ 40, 41). CDS thereafter represented that it was properly handling and transporting Types 1, 2 and 3 freight from ALG and Vertis. (*Id*., p. 22 ¶ 42).

On November 10, 2010, ALG sent a representative to the Harrisburg facility, at which time it was discovered that Vertis mail was not being properly sorted and consolidated, that ALG mail was not being timely delivered and other miscellaneous failures. (*Id*., p. 22–23 ¶ 43). At this time, ALG, through its representative, first discovered that CDS was mishandling Types 1 and 2 freight. (*Id*., p. 23 ¶ 44). Vertis requested a facility visit to review the handling and separation of freight as well as delivery practices. (*Id*., p. 23 ¶ 45). CDS denied this request, stating it was conducting a Board of Directors meting at that time. (*Id*., p. 23 ¶ 46).

On November 17, 2010, CDS advised ALG that it would only handle Type 1 freight as of November 20, 2010. (*Id*., p. 24 ¶ 49). Considering this action as abatement of the contract by CDS, ALG commenced by-passing the Harrisburg facility and arranging with CDS to clear customer inventory already there. (*Id*., p. 24 ¶ 50). CDS unilaterally cleared all of ALG's freight by loading numerous trailer loads of freight without loading plans or order. (*Id*., p. 24 ¶ 51).

After it parted ways with CDS, ALG allegedly stopped paying rent on the leased space. Clark then filed a separate suit against ALG for breach of the lease. Specifically, Clark's complaint alleges that on June 22, 2010, ALG signed a five-year lease of warehouse space in the Harrisburg facility to maintain a presence and perform tasks in support of its freight-forwarding activities with CDS. ("Sublease Agreement"). (*See* 1:11-CV-1299, Doc. 1 ¶¶ 11, 12; Doc. 1, Ex. A). The Sublease Agreement incorporated terms of the Master Lease between Clark and the master landlord. (*See* 1:11-CV-1299, Doc. 1 ¶ 12; Doc. 1, Ex. B). Under the Sublease Agreement, ALG promised to pay Clark a monthly rent of $10,500.00 the first year and progressively increasing to $34,125.00 in the final year. (*See* 1:11-CV-1299, Doc. 1 ¶ 13).

ALG took possession of the property and began operations but by October, 2010, the relationship between ALG and Clark grew strained. (*See* 1:11-CV-1299, Doc. 1 ¶¶ 14, 15). ALG thereafter defaulted on its obligations under the Sublease Agreement and has made no rental payment since November 23, 2010. (*See* 1:11-CV-1299, Doc. 1 ¶¶ 17, 18). ALG subsequently abandoned the premises and has failed to cure its default. (*See* 1:11-CV-1299, Doc. 1 ¶¶ 21, 22). During this time, Clark contends it was obligated to pay rent under the Master Lease, as a result of

which Clark avers that it incurred damages in excess of 1.2 million dollars. (*See* 1:11-CV-1299, Doc. 1 ¶¶ 23, 24).

In response to Clark's suit for breach of real estate sublease, ALG filed a third-party complaint against Clark's subsidiary, CDS, asserting claims for tortious interference and civil conspiracy. (*See* 1:11-CV-1299, [Doc. 9](#)).

## II. Issue Presented

The sole issue presented is whether ALG's counterclaim of tortious interference has a legal basis.

## III. Standard of Review

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for dismissal of claims that fail to assert a basis upon which relief can be granted. When considering a motion to dismiss, the court must "accept all [of plaintiff's] factual allegations as true, construe the complaint or counterclaim in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. County of Allegheny,* 515 F.3d 224, 233 (3d Cir. 2008) (citing *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002)). *See also Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1322–23 (2011).

The complaint or counterclaim must set forth sufficient facts to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The question is not whether the plaintiff will ultimately prevail, but whether the "complaint [or counterclaim is] sufficient to cross the federal court's threshold." *Skinner v. Switzer*, 131 S. Ct. 1289, 1296 (2011)(citing *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 514 (2002)).

Although Rule 8(a)(2) requires only a "short and plain statement of the claim showing that the pleader is entitled to relief," a plaintiff must do more than present "bald assertions" and "legal conclusions." *In re Burlington Coat Factory Secs. Litig.*, 114 F.3d 1410, 1429–30 (3d Cir. 1997).

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do. Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true.

*Twombly*, 550 U.S. at 545 (citations omitted). Plaintiffs must nudge their claims "across the line from conceivable to plausible." *Id.* at 570. *See also Phillips,* 515 F.3d at 232.

A plaintiff "armed with nothing more than conclusions" is not entitled to discovery. *Ashcroft v. Iqbal*, 556 U.S. 662, 679, 129 S. Ct. 1937, 1950 (2009).

Consequently, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not 'show[n]' — 'that the pleader is entitled to relief,'" and the complaint should be dismissed. *Id.* (quoting Fed. R. Civ. P. 8(a)(2)) (alteration in original).

The "plausible grounds" requirement "does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence" supporting the plaintiff's claim for relief. *Twombly*, 550 U.S. at 556. Determining plausibility is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 129 S. Ct. at 1950 (*citing Twombly*, 550 U.S. at 557–58).

The Third Circuit has outlined a two-part analysis that courts should utilize when deciding a motion to dismiss for failure to state a claim. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). First, the factual and legal elements of a claim should be separated. In other words, while courts must accept all of the complaint's or counterclaim's well-pleaded facts as true, they may disregard any legal conclusions. Second, courts then decide whether the facts alleged in the complaint or counterclaim are sufficient to demonstrate that the plaintiff has a "'plausible claim for relief.'" *Id.* at 210 (quoting *Iqbal*, 129 S. Ct. at 1950). That is,

a complaint must do more than allege the entitlement to relief; its facts must show such an entitlement. *Id.* at 211.

## IV. Discussion

Count V of ALG's counterclaim asserts a claim for tortious interference with quiet enjoyment relating to ALG's ouster and subsequent eviction from the Harrisburg facility. ALG notes that the thrust of this claim is a tortious interference with contractual relations which Pennsylvania courts have recognized as a cause of action.

Pennsylvania has adopted the Restatement (Second) of Torts § 766 regarding tortious interference, which authorizes a claim of tortious interference to be brought against a person not a party to the contract. *Kernaghan v. BCI Communications, Inc.*, 802 F.Supp.2d 590, 595 (E.D.Pa.2011). Section 766 provides:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

The following elements must be met for a tortious interference claim under Pennsylvania law:

(1)   the existence of a contractual, or prospective contractual relation between the complainant and a third party;

(2)   purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring;

(3)   the absence of privilege or justification on the part of the defendant; and

(4)   the occasioning of actual legal damage as a result of the defendant's conduct.

*Corrections U.S.A. v. McNany*, --- F.Supp.2d ----, 2012 WL 3779634, *7 (M.D. Pa. Aug. 31, 2012) (quoting *Kernaghan,* 802 F.Supp.2d at 596) (citations omitted). "Essential to a right of recovery ... is the existence of a contractual relationship between the Plaintiff and a 'third person' other than the Defendant." *Kernaghan, supra* (quoting *Daniel Adams Associates, Inc. v. Rimbach*, 519 A.2d 979, 1000 (1987). *See also Motise v. Parrish*, 297 F. App'x. 149, 152 (3d Cir.2008) ("[A] party to the contract, may not tortiously interfere with the contract.")). Both federal and state courts applying Pennsylvania law on tortious interference "have acknowledged that a tortious interference claim cannot be asserted against a party to the contract." *Id*. (citations omitted).

*A. Contractual relationship with a third party*

It is undisputed that the Transportation Agreement was a contract ALG had with CDS to forward its freight. However, to satisfy the first element of a prima facie case of tortious interference, a complainant must identify a contractual relationship, or prospective one, between it and a third party. ALG points to the real estate sublease agreement by which it contracted with Clark, CDS's parent company, to lease part of the space in the Harrisburg facility. That Clark and CDS consider themselves separate entities is evidenced by the fact that each filed a separate suit against ALG, based upon independent contracts. Thus, this contractual relationship satisfies the first element of a prima facie case.

*B. Purposeful action by CDS*

Purposeful action intended to harm an existing contract can exist even where the "the actor does not act for the purpose of interfering with the contract or desire it but knows that the interference is certain or substantially certain to occur as a result of his action." *Odyssey Waste Services, LLC v. BFI Waste Systems of North America, Inc.*, No. 05-CV-1929, 2005 WL 3110826, *5 (E.D. Pa. Nov. 18, 2005) (quoting Restatement (Second) Torts § 766, cmt. j).

As to the second element, the counterclaim avers that CDS took intentional actions with the intent of harming ALG's existing relationship with Clark.

Specifically, ALG asserts that CDS was aware of the terms of the sublease between ALG and Clark (Doc. 57 ¶ 86); CDS had control of the all shipments moving into ALG's leased space in the Harrisburg facility (*id*. ¶ 87); CDS intentionally abandoned its contract upon which the sublease was dependent by refusing involvement with Vetris shipments and by sending ALG's customers' shipments via Nationwide Southeast (*id*. ¶ 88); CDS intentionally forced ALG out of the Harrisburg facility by ceasing services and by ordering ALG to abandon its tenancy (*id*. ¶ 89). Such averments allege that CDS acted with the intent to interfere with and to harm the existing contractual relationship between ALG and Clark, and thus are sufficient to state the second element of a prima facie case of tortious interference

### C. Lack of privilege or justification

In the context of tortious interference with contractual relation claims, "[t]he presence of a privilege is not an affirmative defense, rather, the absence of such a privilege is an element of the cause of action which must be pleaded and proven by the plaintiff." *Bahleda v. Hankison Corporation*, 228 Pa. Super. 153, 156, 323 A.2d 121, 122–123 (1974) (internal citations omitted).[6] To determine whether a

---

[6] Pennsylvania courts look to the factors set out in section 767 of the Restatement (Second) of Torts when determining whether interference was "improper," including: (a)
(continued...)

defendant's actions are privileged or proper, the central inquiry is whether the defendant's interference is sanctioned by the "rules of the game" which society has adopted, looking at the propriety of the defendant's conduct as a whole. *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 185 (3d Cir.1997). A finding of ill will or an intent to harm is not required to determine that an act was non-privileged or improper; rather, only a finding that the defendant interfered with a contract without justification is necessary. *Ruffing v. 84 Lumber Co.*, 410 Pa. Super. 459, 600 A.2d 545, 550 (Pa. Super. Ct.1991).

ALG's counterclaim lacks any factual averment that CDS's actions in impeding the fulfillment of the sublease and evicting ALG were justified or privileged. This satisfies the third element of a tortious interference claim. *See Perma-Liner Industries, Inc. v. U.S. Sewer & Drain, Inc.*, 630 F.Supp.2d 516, 524 (E.D.Pa. 2008) (third element of a tortious interference claim met when amended

---

[6](...continued)
the nature of the actor's conduct; (b) the actor's motive; (c) the interests of the other with which the actor's conduct interferes; (d) the interests sought to be advanced by the actor; (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other; (f) the proximity or remoteness of the actor's conduct to the interference; and (g) the relations between the parties." RESTATEMENT (SECOND) OF TORTS § 767 (1979); *Adler, Barish, Daniels, Levin and Creskoff v. Epstein*, 393 A.2d 1175, 1184, 482 Pa. 416, 433 (Pa. 1978). At the motion to dismiss stage, a court need not engage in a detailed analysis of the fact-intensive elements enumerated by the Restatement. *Brown & Brown, Inc. v. Cola*, No. 10-3898, 2010 WL 5258067, *6 n.2 (E.D. Pa. Dec. 22, 2010).

complaint alleged no facts that defendants were justified or privileged to pursue the actions taken).

### D. Damages

With respect to the fourth element of a tortious interference claim, ALG asserts it incurred damages as a result of its eviction from the Harrisburg facility, *to wit.*, the lease payments Clark continued to seek after evicting ALG; damages to reworking shipping routes for its products; and damages incurred by ALG in lost business as a result of dissatisfied customers. For purposes of a motion to dismiss, ALG has alleged sufficient facts to establish this element. Accordingly, ALG has stated a prima facie case of tortious interference with contractual relations and the motion to dismiss the counterclaim should, therefore, be denied.

## V. Recommendation

For the foregoing reasons, it is respectfully recommended that the motion to dismiss ([Doc. 58](#)) be denied as to ALG's counterclaim for tortious interference with quiet enjoyment (Count V). It is also recommended that ALG's counterclaim

for negligent misrepresentation (Count VII), which was voluntarily withdrawn, be dismissed without prejudice.

Signed April 24, 2013.

_____
MILDRED E. METHVIN
U. S. MAGISTRATE JUDGE