IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| CLARK DISTRIBUTION | : | CIVIL ACTION NO. 1:10-CV-02575 |
| SYSTEMS, INC., | : | Consolidated with 1:11-CV-1299 |
| | : | |
| Plaintiffs, | : | |
| | : | (Chief Judge Conner) |
| v. | : | |
| | : | |
| ALG DIRECT, INC., | : | |
| | : | (Magistrate Judge Schwab) |
| Defendant. | : | |

## REPORT AND RECOMMENDATION

In this consolidated civil action, the plaintiffs have filed an omnibus motion for summary judgment. For the reasons set forth herein, I recommend that the motion be granted in part and denied in part.

**I.    Background and Procedural History.**

This matter ("the TSA Case") was initiated on December 17, 2010, when the plaintiff, Clark Distribution Systems, Inc. ("CDS"), filed a complaint against defendant ALG Direct, Inc. ("ALG"), for breach of contract. *Doc.* 1. In its complaint, CDS also raised a claim for negligent misrepresentation against Patrick Del Monico ("Del Monico"); however, on April 20, 2011, Del Monico was voluntarily dismissed. *Doc.* 21. Thereafter, on July 29, 2011, the Court granted ALG's motion to dismiss for lack of subject matter jurisdiction, but CDS was granted leave to amend its complaint. *Id.*

On the same date that the Court dismissed CDS' complaint for lack of subject matter jurisdiction, CDS filed a proper amended complaint. *Doc.* 33. In the amended complaint, CDS brought a breach of contract claim against ALG, seeking payment for services rendered under a transportation services agreement ("TSA"). *Id.*

Several months later, on January 26, 2012, the Court granted a joint motion to consolidate this matter with *Clark Group, Inc. v. ALG Direct, Inc.* (No. 1:11-CV-1299, CCC)("The Sublease Case"). *Doc.* 48. In the Sublease Case, the plaintiff, Clark Group, Inc. ("Clark"), filed a complaint against ALG for breach of contract seeking payments for rent under the terms of a sublease executed between the parties. (1:11-CV-1299, *Doc.* 1). After answering the complaint, ALG filed a third-party complaint against CDS. (1:11-CV-1299, *Doc.* 9). Generally, in the third-party complaint, ALG claims that it should not be liable to Clark for any damages because CDS tortuously interfered with the sublease through its alleged abandonment of the TSA. *Id.* As well, ALG rebukes liability on grounds that CDS and Clark conspired to cause it to default on the sublease. *Id.* On November 14, 2011, Clark filed its answer to ALG's third-party complaint. (1:11-CV-1299, *Doc.* 12).

On September 10, 2012, after the cases had been consolidated, ALG answered CDS' amended complaint from the TSA Case. *Doc.* 57. Along with its

answer, ALG contemporaneously asserted several counterclaims against CDS for damages allegedly incurred due to CDS' purported mishandling of freight. *See generally*, *id.*

On April 15, 2013, after the discovery deadline lapsed (*see Doc.* 63), CDS and Clark filed an omnibus motion for summary judgment. *Doc.* 65. Along with the motion, CDS and Clark filed a brief in support, statements of fact, and supporting documents. *Docs.* 66, 67 & 68. On May 6, 2013, ALG filed a timely brief in opposition, counterstatements of fact, and other documents. *Docs.* 71 & 72. Thereafter, on May 20, 2013, CDS and Clark filed a timely reply brief along with an answer to ALG's counterstatement of facts. *Docs.* 75 & 76. The motion, having been fully briefed, is ripe for disposition on the merits.

## II.    **Factual Statement.**[1]

Clark is the parent company of CDS, which is a logistics and transportation company that provides freight forwarder services, such as facilitating the delivery of newsstand publications, magazines, and mass-market mailings from publishing and printing companies to their consignees, including the United States Postal Service ("USPS"). ALG is a logistics company that often works with freight

---

[1]    In accordance with the standard of review for a motion for summary judgment, I will present the facts in the light most favorable to ALG, the nonmoving party. *See, infra*, Part III.

3

forwarders and carriers to arrange for the distribution of its clients' freight, normally printed materials.

In early 2010, CDS and ALG began negotiating the formation of an alliance wherein, *inter alia*, CDS would serve as ALG's exclusive freight forwarder in specific regions throughout the United States. *Doc.* 67 at ¶ 3. Later, on June 28, 2010, CDS and ALG entered into a TSA that applied to the performance of interstate, intrastate, and international transportation, and related services, performed by CDS for ALG. *Id.* at ¶ 4; *Doc.* 67-3 at 2.

Around the same time that the alliance negotiations were ongoing, Clark and ALG executed a sublease agreement, wherein ALG agreed to sublease one-half of Clark's warehouse in Harrisburg, Pennsylvania (the "Harrisburg Site").[2] *See Doc.* 67 at ¶ 7. ALG entered into the sublease agreement because it desired to have a Pennsylvania facility where Clark handled the delivery work, while ALG handled co-mail and co-palletization operations after installing its own equipment. *Doc.* 68-2 at 3. ALG's agreement to sublease portion of the Harrisburg Site was part of a mutual promise whereby ALG would sublease a portion of the Harrisburg Site and Clark or CDS would sublease a portion of ALG's Illinois facility. *Doc.* 71 at ¶ 58. According to ALG, this mutual promise was expressed in the parties' letter of

---

[2] According to the master lease, the warehouse contained approximately 252,000 total square feet (*see Doc.* 67-2 at 24). Of that amount, ALG subleased approximately 126,000 square feet (*see Doc.* 67-1 at 2).

intent, which was executed *before* the sublease agreement. *See id.* The sublease, though, contained an integration clause and made no reference to either the TSA or to any letter of intent.[3] *Doc.* 67-1.

In October 2010, ALG's clients began submitting freight to the Harrisburg Site for freight forwarding services. *Doc.* 67 at ¶ 30. As soon as the operations began, however, one of ALG's clients, Vertis Incorporated ("Vertis"), submitted freight that "materially deviated" from the contract held between it and ALG, and the freight failed to comply with USPS regulations. *Doc.* 67-9 at 7-10. Nevertheless, CDS attempted to service the Vertis freight on ALG's behalf. *Doc.* 67 at ¶ 32. But, delays arose, and according to ALG, in a complaint filed in Illinois state court against Vertis, the deviations "materially contributed" to such delays. *Doc.* 67-9 at 11. Also, as the delays arose, the Harrisburg Site became saturated with Vertis freight. *Doc.* 67 at ¶¶ 33-34.

In handling the Vertis freight, CDS merely placed it on the warehouse floor without inventorying it. *See Doc.* 71-3 at 37. Clark and CDS also failed to inform ALG that the Vertis freight was received. *Id.* Further, CDS did not timely deliver other freight that was properly tendered with the accompanying documentation

---

[3] A draft version of the parties' letter of intent included language suggesting that the sublease term be tied to the length of the parties' relationship under the TSA. *Doc.* 67 at ¶ 13; *see Doc.* 67-5 at 2. But, that language never made it into the executed sublease.

(i.e. Form 8125). At no time during the delays did either Clark or CDS complain that it could not deliver the Vertis commodities or that ALG should stop sending, or slow down, the commodities being submitted to the Harrisburg Site. *Doc.* 71 at ¶¶ 76-78. Regardless, because of the delays and customer complaints, ALG sent an employee to assess the situation and help CDS process the freight. *Id.* at ¶ 35.

Later, on November 18, 2010, CDS sent an e-mail to ALG's CEO informing him that on November 20, 2010, CDS would no longer handle any of the Vertis freight that "materially deviated" from the Vertis / ALG contract, and any freight that failed to comply with USPS regulations. *Id.* at ¶ 79. Also, CDS demanded in the email that ALG assign full-time employees to handle such freight at the Harrisburg Site. *Id.* At the time, the Vertis commodities in question accounted for approximately 50% of the freight received at the Harrisburg Site. *Id.*

Around this same time, ALG became aware that CDS had allowed certain commodities to sit undelivered within the Harrisburg Site for at least two to three weeks. *Id.* at ¶ 80. ALG further learned that only portions of complete jobs were tendered to their clients. *Id.* Also, during this period, ALG received complaints from clients about non-delivery or late delivery of their commodities. *Id.* at ¶ 81. As a result, the parties agreed that ALG would divert all freight away from the Harrisburg Site while ALG employees attempted to organize the freight that was already there. *Id.* at ¶ 82.

Subsequently, around Thanksgiving 2010, ALG staged a number of loads for CDS to deliver to Nationwide (another logistics and transportation company) for ultimate delivery to the USPS, "because Clark was incapable of getting the trucks loaded." *Id.* at ¶ 83. CDS, however, failed to deliver that freight as staged; instead, the commodities were loaded in a largely disorganized manner and sent to Nationwide. *See id.* at ¶ 84. ALG then stopped paying invoices under the TSA and rent under the sublease; all of this occurring in mid- to late November 2010. *Id.* at ¶¶ 41-42. Approximately one month later, on December 17, 2010, legal counsel for Clark and CDS sent a letter to ALG demanding that ALG "immediately cease shipping of any additional Commodities and make arrangements to collect all Commodities located at CDS facilities." *Id.* at ¶ 85. The last payment ALG made under the sublease was in November 2010. *Id.* at ¶ 42.

### III. The Summary Judgment Legal Standard.

Summary judgment is appropriate only when "the movant shows that there is no genuine issue as to any material fact," and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a). Although the movant has the initial burden of demonstrating the absence of genuine issues of material fact, the non-movant must then establish the existence of each element on which he bears the burden of proof. *J.F. Feeser, Inc. v. Serv–A–Portion, Inc.*, 909 F.2d 1524,

1531 (3d Cir. 1990) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). The non-moving party may not rest on his pleadings but must come forward with competent evidence from which a reasonable factfinder could render a verdict in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989); *Woods v. Bentsen*, 889 F.Supp. 179, 184 (E.D. Pa. 1995). Only if this threshold is met may the cause of action proceed. *Pappas*, 331 F.Supp.2d at 315.

Accordingly, in deciding a motion for summary judgment, the Court must view the evidence, making all reasonable inferences from the evidence in the light most favorable to the non-moving party. *Bouriez v. Carnegie Mellon Univ.*, 585 F.3d 765, 770 (3d Cir. 2009). Whenever a factual issue arises which cannot be resolved without a credibility determination, at this stage the Court must credit the non-moving party's evidence over that presented by the moving party. *Anderson*, 477 U.S. at 255. If there is no factual issue and if only one reasonable conclusion could arise from the record regarding the potential outcome under the governing law, summary judgment must be awarded in favor of the moving party. *Id.* at 250.

## IV. **Discussion.**[4]

In its omnibus motion, Clark argues that summary judgment is warranted on its breach of contract claim in the Sublease Case. *See Doc.* 66 at 4-17. As well, CDS argues that partial summary judgment should be granted in the TSA Case on ALG's counterclaims that seek an indemnification obligation for future damages incurred against Vertis. *Id.* at 17-21. For the following reasons, I recommend that the motion for summary judgment be granted in part and denied in part.

### A. The TSA Case.

CDS argues that partial summary judgment should be granted on ALG's counterclaims for damages associated with claims brought against ALG by Vertis. Specifically, CDS contends that those counterclaims are not ripe because ALG has not yet incurred any Vertis damages, as that issue is currently being litigated in Illinois state court. While this motion was pending, however, ALG was granted

---

[4] Here, the parties agree that Pennsylvania law governs this action, and it is well-established that "federal courts sitting in diversity cases are required to apply the substantive law of the state whose laws govern[s]…." *Robertson v. Allied Signal, Inc.,* 914 F.2d 360, 378 (3d Cir. 1990). Where there is no guidance from the Commonwealth's highest court, my task is to predict how that high court would resolve the matter. *See id.* "In making such predictions [I] recognize that the state's highest authority is the best authority on its own law and that if there be no decision by that Court then [I] must apply what [I] find to be the state law after giving proper regard to the relevant rulings of other courts of the state." *Id.* (quotations and citations omitted). Thus, "[my] role is not to form or create state law but to decide the case as [I] believe it would have been decided by the state's highest court had the [issue] arisen in the state court system." *Id.* (citing *Becker v. Interstate Properties*, 569 F.2d 1203, 1205 n. 5 (3d Cir. 1977)).

leave to file an amended counterclaim. *Doc.* 92. On August 5, 2013, ALG filed its amended counterclaim and removed the Vertis damages therein. *See Doc.* 93 at ¶¶ 54, 67; *see also Doc.* 72 at 14. As such, CDS' motion for summary judgment in the TSA case should be denied as moot.[5]

### B. The Sublease Case.

Clark argues that summary judgment in its favor is warranted because the record unequivocally demonstrates that ALG breached the sublease by *sua sponte* withholding payments, in contradiction to the sublease's terms. *Doc.* 66 at 4. In particular, Clark relies upon Paragraph 8 of the sublease which states:

> In the event [Clark] defaults in keeping, observing or performing any of the terms, provisions, covenants and conditions contained in the Lease or this Sublease, and such default is not cured (or proper corrective measures to cure such default commenced) by [Clark] within the periods specified for the curing of such defaults, [ALG] shall have the right to remedy such default after it gives [Clark] written notice thereof.

*Id.* at 6; *Doc.* 67-1 at 5. According to Clark, ALG never gave written notice of any alleged default of obligations under the sublease before withholding payments; therefore, ALG breached the agreement. *Doc.* 66 at 6.

Under Pennsylvania law, "a lease is a contract and is to be interpreted according to contract principles." *Kingsly Compression, Inc. v. Mountain Oil &*

---

[5] On August 20, 2013, CDS filed a partial motion to dismiss ALG's amended counterclaim. *Doc.* 94. The motion became ripe on September 13, 2013, and it will be addressed in a separate report and recommendation.

*Gas, Inc.*, 745 F.Supp.2d 628 (W.D.Pa. 2010)(quoting *Hutchison v. Sunbeam Coal Corp.*, 519 A.2d 385, 389 (Pa. 1986)). Thus, to make out a claim for breach of contract, a plaintiff must establish three elements: (1) the existence of a contract, (2) the breach of some duty imposed by that contract, and (3) resulting damages. *Johnson v. State Farm Life Ins. Co.*, 695 F.Supp.2d 201, 212 (W.D.Pa. 2010)(citing *Pennsy Supply, Inc. v. American Ash Recycling Corp.*, 895 A.2d 595, 600 (Pa. Super. 2006)).

Here, there is no dispute that a valid, final, contract existed between the parties in the form of a sublease. As well, there is no dispute that ALG has withheld rent payments. *Doc.* 71 at ¶¶ 41-42. ALG, however, argues against granting summary judgment in Clark's favor contending that the implied covenant of quiet enjoyment was breached in that it was actually and constructively evicted from the Harrisburg Site.

According to ALG, the intention of the parties with respect to the sublease is reflected in the letter of intent and further reinforced by the plain language of the TSA. *Doc.* 72 at 5, 6. ALG argues that the parties' intention was to provide space for CDS to handle, warehouse, consolidate, and prepare ALG's customers' commodities for ultimate delivery to the USPS. *Id.* at 10. CDS, though, did not comply; instead, it unilaterally and unjustifiably refused to handle most commodities and ended up forcibly removing ALG's freight. *Id.* at 9-10. Thus,

11

ALG contends that CDS' refusal and forcible removal of Vertis freight constituted an overt restriction on the use of the subleased premises and ultimately decreased the premises' utility by requiring ALG to route around the Harrisburg Site resulting in a constructive eviction. *Id.* at 10.

As mentioned, ALG also argues that it was actually evicted. According to ALG, it was actually evicted from the Harrisburg Site when Clark's counsel sent a letter on December 17, 2010, demanding that ALG "cease shipping of any additional [c]ommodities and make arrangements to collect all [c]ommodities located at CDS facilities." *Doc.* 72 at 11.

Clark counters by contending that ALG's argument that it was constructively evicted is factually and legally untenable. Clark contends that ALG cannot rely upon the letter of intent or the TSA to demonstrate the parties' intent under the sublease given that Paragraph 12 of the sublease contained an integration clause. *Doc.* 75 at 4-5. In pertinent part, Paragraph 12 of the sublease states, "No terms, conditions, warranties, promises or understandings of any nature whatever, expressed or implied, exist between the parties except as may be expressly set forth." *Doc.* 67-1 at 6. Clark also contends that any action on its part that might have constituted a breach under the TSA does not rise to the level of interference with actual possession necessary to constitute a breach of quiet enjoyment under the sublease. *Doc.* 75 at 9. Furthermore, Clark contends that the sublease was not

limited to ALG's operations under the TSA, because the TSA included reference to an independent operation that ALG was to develop in the leased space, and the diagram attached to the sublease expresses the same. *See id.* at 9-10. Last, with respect to ALG's constructive eviction argument, Clark argues that ALG was not forced to route around the Harrisburg Site; instead, ALG unilaterally made that decision. *Id.* at 11-12.

With regard to ALG's argument that it was actually evicted from the subleased premises, Clark's response is two-fold: (1) "[t]he CDS facilities referenced in the letter are the various CDS facilities other than Harrisburg where ALG's customers submitted freight and in which ALG held no interest" and (2) ALG had already abandoned the Harrisburg Site when it withheld rental payments beginning in November 2010. *Docs.* 66 at 14-15 & 75 at 13-14.

### 1. Interpretation of the Sublease.

In Pennsylvania, it is a basic premise that the interpretation of any contract, such as a sublease, is a question of law. *Humberston v. Chevron U.S.A., Inc.*, No. 1270 WDA 2012, 2013 WL 4429159, at *4 (Pa. Super. Ct. Aug. 20, 2013). "The purpose [of] interpreting a lease, like a contract, is [to ascertain] the intention of the parties, and in doing so recourse must be had to the terms of the writing itself." 30 Pennsylvania Law Encyclopedia, Landlord and Tenant § 27 (2003). Such terms, in the absence of ambiguity, furnish the true guide to the parties' intention;

therefore, the plain meaning of the language of a lease is to be given effect. *See Drysdale v. Woerth*, 153 F.Supp.2d 678, 685 (E.D.Pa. 2001)(quoting *Warren v. Greenfield*, 595 A.2d 1308, 1311 (Pa. Super. Ct. 1991))("[T]he intent of the parties to a written contract is regarded as embodied in the writing itself."); *Willison v. Consolidated Coal Corp.*, 637 A.2d 979, 982 (Pa. 1994). Moreover, the parol evidence rule bars evidence of prior representations in a fully integrated contract. *See Rahemtulla v. Hassam*, 539 F.Supp.2d 755, 772 (M.D.Pa.2008) (citations omitted). "Where a written contract contains an integration clause, 'the law declares the writing to not only be the best, but the only evidence of the parties' agreement.'" *Id.* at 772-73 (quoting *Yocca v. Pittsburgh Steelers Sports, Inc.*, 578 Pa. 479, 854 A.2d 425, 436 (2004)). Integration clauses thus serve to give effect to the parol evidence rule: "the written contract, if unambiguous, must be held to express all of the negotiations, conversations, and agreements made prior to its execution, and neither oral testimony, nor prior written agreements, or other writings, are admissible to explain or vary the terms of the contract." *Id.* at 773 (quoting *Hart v. Arnold*, 884 A.2d 316, 341 (Pa.Super.Ct. 2005)). Nevertheless, even where a contract contains an integration clause, a court may evaluate extrinsic evidence, including bargaining history, to determine whether contractual language is ambiguous and to clarify an ambiguous contractual term. *Bethlehem Steel Corp. v. United States*, 270 F.3d 135, 139 (3d Cir. 2001); *see also Neff v. Cooper*

*Hosp./Univ. Medical Center*, No. CIV. A. 96-5875, 1999 WL 667283, at *8 (E.D. Pa. Aug. 24, 1999)("Where, as in this case, the Court determines that a contract with an integration clause contains ambiguous terms, it is appropriate to receive in evidence parol evidence … to explain the meaning of the ambiguous terms.").

The term "ambiguous" has been defined as "intellectual uncertainty; ... the condition of admitting two or more meanings, of being understood in more than one way, or referring to two or more things at the same time." *Mellon Bank, N.A. v. Aetna Business Credit*, 619 F.2d 1001, 1011 (3d Cir. 1980). In other words, when the court can divine the term's meaning "without any guide other than a knowledge of the simple facts on which, from the nature of the language in general, its meaning depends," the term is not ambiguous. *Baney v. Eoute*, 784 A.2d 132, 136 (Pa. Super. Ct. 2001). Last, in determining whether the relevant contractual terms are ambiguous, courts must be careful not to consider inadmissible evidence. *See Geiserman v. MacDonald*, 893 F.2d 787, 793 (3d Cir. 1990); *Iwashyna v. Dep't of Housing and Urban Dev.*, 1993 W.L. 313702, at *4 (E.D. Pa. Aug. 13, 1993).

Here, as stated *supra*, the sublease contained an integration clause. In addition, the sublease makes no reference to the TSA or the letter of intent. In fact, the TSA contains its own integration clause, *Doc.* 67-3 at 9, and makes no reference to the sublease. Certainly, if the TSA or letter of intent was material to ALG's purpose for subleasing the Harrisburg Site, it would have been included (or

15

at least referenced) in the sublease. ALG also does not argue that any of the sublease's terms were ambiguous. Rather, ALG merely argues, without once referencing the sublease's terms, that the TSA and letter of intent should be evaluated in connection with the sublease to understand the parties' intentions. Furthermore, I have evaluated the sublease, and I find no ambiguities contained within it, with regard to the parties' intent. I am precluded, therefore, as a matter of law, from taking extrinsic evidence such as the letter of intent or the TSA into consideration.[6]

## 2. The Covenant of Quiet Enjoyment.

In Pennsylvania, even if it is not expressed in a lease, the covenant of quiet enjoyment is implied. *Kohl v. PNC Bank Nat'l Ass'n*, 912 A.2d 237, 248 (Pa. 2006). The legal implication of the covenant is that the lessor will permit the tenant to enjoy fully the demised premises subject to any rights reserved to the lessor. *Checker Oil Co. of Delaware, Inc. v. Harold H. Hogg, Inc.*, 380 A.2d 815 (Pa. Super. Ct. 1977). The covenant is breached when the landlord blocks the tenant's access to the premises or changes some essential aspect of the premises so substantially as to render the property unsuitable for the purposes for which it is

---

[6] ALG makes much of the distinction between CDS and Clark. Rather than viewing them as separate entities, for purposes of its argument, ALG contends they are one in the same. Regardless, it is entirely possible for ALG to have executed two separate and wholly unrelated agreements with one entity. Thus, for these purposes, ALG's distinction is irrelevant.

leased.  *See 2401 Pennsylvania Avenue Corp. v. Federation of Jewish Agencies of Greater Philadelphia*, 489 A.2d 733, 738 (Pa. 1985); *Pollock v. Morelli*, 369 A.2d 458, 460 (Pa. Super. Ct. 1976).  Under this basic premise, the Pennsylvania courts have long held that a covenant of quiet enjoyment is breached only when the tenant's actual possession is impaired.  *Rittenhouse v. Barclay White Inc.*, 625 A.2d 1208, 1211 (Pa. Super. Ct. 1993)(citing *2401 Pennsylvania Avenue Corp.*, 489 A.2d 733 (Pa. 1985)).  Thus, actual or constructive eviction is required before such a breach will be found.  *Id.* (citing *Derrickheim v. Brown*, 451 A.2d 477 (1982) (a breach of the covenant for quiet enjoyment does not occur until lessee is evicted from the premises)).

Here, I am unpersuaded that reasonable jurors could find that the covenant of quiet enjoyment, whether expressed or implied, was breached, even when reviewing the facts in the light most favorable to ALG.  As an initial matter, I have already determined, *supra*, that the sublease is clear and unambiguous as a matter of law.  Under the sublease, ALG's intended use of the Harrisburg Site was for "general warehouse purposes" and other "common and usual purposes pertaining to [its] business."  *Doc.* 67-1 at 5.  As ALG admits in its counterstatement of facts, only part of its business involves working with freight forwarders and carriers to arrange for the distribution of freight belonging to its customers.  *Doc.* 71 at ¶ 2.  ALG's CEO provided deposition testimony explaining that ALG would be

17

conducting other business operations out of the Harrisburg Site, in addition to the operations underlying the TSA. *See Doc.* 68-2 at 3. And, in fact, the sublease makes reference to ALG's intent to conduct other business operations at the Harrisburg Site, given its option to bring in other machinery, such as co-mail machines. *See Doc.* 67-1 at 3 [Paragraph 2.3].

Thus, while a breach of the TSA might have required certain freight that CDS was expected to handle to be rerouted, ALG still maintained the right and privilege under the sublease to enter and use the Harrisburg Site for business purposes other than what was contained in the TSA. And, there is nothing in the record demonstrating that as a result of the purported breach ALG was blocked from the Harrisburg Site or that the Harrisburg Site was changed in some essential aspect so as to substantially render the property unsuitable for ALG's use of it for its business operations. Rather, ALG chose to stop making rental payments to Clark and abandoned the Harrisburg Site when it became dissatisfied with Clark's handling of the Veritas Freight. Additionally, ALG's decision to withhold rental payments occurred before Clark sent ALG the letter demanding that ALG "cease shipping of any additional [c]ommodities and make arrangements to collect all [c]ommodities located at CDS facilities."[7] Thus, there was certainly no actual

---

[7] It is irrelevant whether Clark intended that the letter refer to locations other than the Harrisburg Site given that the letter was sent after ALG began withholding rental payments.

eviction. Moreover, given these facts, no reasonable juror could find that ALG was constructively evicted from the Harrisburg Site resulting in a breach of the covenant of quiet enjoyment. In essence, ALG's actual possession was not interfered with as a result of any purported breach of the TSA. As a result, Clark should be entitled to summary judgment on its breach of contract claim.

V. **Recommendation.**

Accordingly, for the foregoing reasons, **IT IS RECOMMENDED** that:

(1) Clark's and CDS' omnibus motion for summary judgment (*Doc.* 65) be

   **GRANTED IN PART** and **DENIED IN PART**:

   a. The motion should be **GRANTED** with respect to the Sublease Case; and

   b. The motion should be **DENIED** as moot with respect to the TSA Case.

(2) The case shall remain open pending resolution of ALG's third-party complaint against CDS for liability on the sublease.

The Parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to

which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Failure to file timely objections to the foregoing Report and Recommendation may constitute a waiver of any appellate rights.

Submitted this **3rd** day of **December, 2013**.

*S/ Susan E. Schwab*
Susan E. Schwab
United States Magistrate Judge